554 So.2d 820 (1989)
STATE of Louisiana
v.
Thelma A. HORNE.
No. 89-KA-424.
Court of Appeal of Louisiana, Fifth Circuit.
December 13, 1989.
John M. Mamoulides, Dist. Atty., W.J. LeBlanc, Dorothy A. Pendergast, Asst. Dist. Attys. (Louise Korns, of counsel), Gretna, for plaintiff-appellee.
Martha E. Sassone, Indigent Defender Bd., Gretna, for defendant-appellant.
Before KLIEBERT, GAUDIN and GRISBAUM, JJ.
KLIEBERT, Judge.
Thelma Horne, defendant, was indicted[1] by a Jefferson Parish Grand Jury with the *821 first degree murder of Andre Daigle while in the perpetration of an armed robbery, a violation of LSA-R.S. 14:30. Following trial by a twelve person jury, defendant was convicted on the responsive verdict of second degree murder and given the mandatory sentence of life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. She was also given credit for time served.
On appeal, defendant alleges the trial court erred in refusing to grant a new trial and the evidence was not sufficient to justify the verdict. Defendant also requests an error patent review. For the following reasons, defendant's conviction and sentence are affirmed.
FACTS
On the evening of June 9, 1987, Andre Daigle and Nick Shelley met for dinner at Chi-Chi's Restaurant. After dinner, they decided to shoot pool and happened upon Mitchell's Lounge. They arrived between 10:00 and 10:30 p.m. and began shooting pool with the loser buying a round of beer. There were several persons in the bar; Daigle, Shelley, the barmaid, Horne and (according to Shelley's testimony)[2] Michael Philips.
Daigle lost the first game and approached the bar to buy a round of beer. Horne was seated at the bar and struck up a conversation with him. After three or four games of pool in which Daigle twice bought beer at the bar and spoke with defendant, Daigle and Shelley decided to leave. The time was then between 11:00 and 11:30 p.m.
Before leaving, Daigle and Shelley approached the bar to get a beer for the road. Daigle introduced Shelley to the woman (Horne) he had been talking to as "Thelma". According to Shelley, Horne avoided eye contact with him.
Daigle and Shelley stayed at the bar a couple of minutes discussing whether to go home or to another nightclub. Daigle suggested going to "Bart's" and Horne asked Daigle if she could go and ride with him. The three then left the bar. Shelley got in his vehicle and went home. Daigle and Horne got in Daigle's truck and left. The next time Daigle was seen, his body was pulled from the swamp near LaPlace. He had been beaten in the head at least ten times with a blunt object, strangled, then wrapped in a curtain and nailed into a sofa.
Dr. Paul McGarry, a forensic pathologist, performed an autopsy on the victim, stipulated by the defense as being Andre Daigle. Dr. McGarry opined the cause of death was multiple head injuries (at least 10 blows) and strangulation.
The evidence showed that Horne, Philips and Gervais lived together in a two bedroom apartment. Philips and Horne shared a bedroom. Financial problems beset the trio as they were threatened with eviction from their apartment for non-payment of rent and relied on a vehicle that ran badly. The curtains and sofa in which Daigle's body was found came from the Horne apartment.
Tammy Slaughter Gervais, hereafter Tammy, testified for the State. She was a neighbor and friend of defendant, Philips and Gervais, at the time of the murder. She has since married Charles Gervais' brother.
Tammy testified she spent the day of June 9, 1987 with Horne, Philips and Gervais watching television in their apartment. Later, the three went to her apartment, which she shared with her mother and sister, to cook dinner. At about 6:00 p.m. defendant left after borrowing clothes from Tammy's sister to go out. At about 9:30, after Mrs. Slaughter, Philips and Gervais ate supper, Horne returned, spoke with Philips outside, then she and Philips *822 left together. Gervais left the Slaughter apartment about 10:00 p.m.
At about 12:00 to 12:30 a.m., Horne returned to the Slaughter apartment and asked to use the phone. Tammy refused because her mother denied visitors after 10:00 p.m.
The next morning around 10:00 a.m., Tammy went to defendant's apartment. She immediately noticed it was very cold in the apartment and a maroon sofa had been moved. Tammy and Gervais sat on the sofa and watched television. About fifteen minutes later, Horne and Philips came downstairs. Tammy asked why it was so cold and defendant replied they were checking the antifreeze. After about forty-five minutes, Tammy left.
Tammy returned to the apartment about 6:00 or 7:00 p.m. on June 10th. It was still cold, the furniture was arranged the same as that morning and Horne, Philips and Gervais were getting dressed to go out. The four left the apartment together and all but Tammy got into a black truck (identified as Daigle's) to leave. Tammy specifically asked whose truck it was and Horne replied that she had borrowed it from a friend.
The next day, June 11, at about 12:00 or 1:00 p.m. Tammy returned to Horne's apartment. Horne let her in and said they were evicted. The temperature was now normal and the maroon sofa was missing. Tammy also noticed a red spot on the carpet.
Timothy Kerns, hereafter Kerns, testified that he worked for the owner of the apartment where Horne lived as a maintenance man and manager. He managed Horne's apartment in June of 1982 and knew the three occupants; Horne, Philips and Gervais, personally.
Kerns was advised by management that the apartment was vacant. Therefore, he went to clean and paint the apartment on the morning of June 10th. Because he noticed Philips' car out front, he knocked before entering. No one answered, so Kerns let himself in. The trio's furniture was still there, the floors were wet and it was rather chilly. Within a few seconds of his entering, Horne came down, picked up her shoes and purse and rushed him (Kerns) out of the apartment. Kerns was informed by Horne that Philips was in court and when he returned they would have the rent payment. That same day, Philips pawned some of Daigle's belongings. Later that afternoon, Philips and Gervais returned and asked Kerns if they could remain in the apartment until Friday, June 12th. Kerns stated he had to check with management.
Kerns returned to the apartment on June 11th. Philips and Gervais pulled up in Daigle's truck and began moving furniture out of the apartment. Philips offered to sell Kerns his car for $300.00 but Kerns was not interested. Kerns also said he found a lamp with an electric cord missing on the premises.
Gervais and Philips were arrested in Daigle's truck in Pearl River on June 13th. A vacuum cleaner with the cord missing was in the truck at the time of the arrest. They had made little effort to disguise the truck except for tinting the windows. The evidence also showed Philips pawned the truck bed's toolbox and assorted tools on June 10 and 11, 1987. As a result of information furnished by Gervais, Daigle's body was found in the swamp near LaPlace, wrapped in the curtains and nailed inside the maroon sofa taken from defendant's apartment. Daigle was dressed in the same clothes as when he left Mitchell's Lounge with defendant.
ASSIGNMENT OF ERROR NUMBER ONE
Horne contends the trial court erred in failing to order a new trial because the following District Attorney's comments during opening statement were not within the scope of LSA-C.Cr.P. art. 766[3] and so prejudiced the defendant that the trial was *823 rendered fundamentally unfair. The complained-of statement is as follows:
What Nick Shelley could not and did not know at that time was that André Daigle was the unsuspecting victim of a sick and depraved murder plot. You see, the plan was for Thelma Horne to bring someone back to her boyfriend, Michael Philips', apartment, where Michael Philips and his roommate, Charles Gervais, would then rob and kill that person; not to rob and kill André Daigle, specifically; just anybody. And who would decide who was to die? That woman (indicating), Thelma Horne. Because this was the plan: Thelma would go to a bar, pick up a man, bring him back. He would be robbed and killed. They would then take that money and his car, to to [sic] Texas where they would take over a prostitution ring, and possibly join the Mafia.
But let's get back to that fateful night in June. Once inside Michael Phillips' [sic] apartment, Michael Phillips [sic] and his roommate, Charles Gervais, almost literally beat the man's brains in with a hammer. But he wasn't dead, so they took an electric cord from a lamp and strangled him, but the cord broke. But André was still breathing. So finally, they cut the cord from a vacuum cleaner and twisted and twisted and twisted around his throat until he finally died.
But the indignity did not stop there. By this time, it's getting light, so they wrapped the body in a curtain, and then they turned over a hollowed-out wooden sofa and put the corpse inside, then very carefully nailed wooden slats across so that the body wouldn't fall out. Then they turned the sofa back over, pushed it against the wall.
Oh, they also turned the air condition down low to make it cold so the body wouldn't stink.
Prior to the commencement of trial, defendant objected to the State's proposed opening statement. As the State had not yet put on their case, the trial judge did not rule on the objection.
The last witnesses called by the State were Charles M. Gervais and Michael M. Philips. Pursuant to a plea bargain agreement, Gervais and Philips received a life sentence for the murder of Daigle in return for their testimony against defendant. Their testimony was to be used to elicit the details of the murder as per the opening statement. To the District Attorney's surprise, when Philips and Gervais were called to the stand, rather than testify, they refused to answer any questions.
Defendant did not move for a mistrial or an admonition to the jury when the State failed to produce evidence as per the opening statement. They simply moved for a new trial after a guilty verdict was rendered.
New trials are governed by LSA-C.Cr.P. art. 851 which provides:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
*824 The court's denial of the new trial was proper as there were no rulings on written motions or on an objection made during the proceeding which shows prejudicial error. The only ruling complained of concerns the refusal to sustain defendant's objection to the State's opening statement. Thus, we see no error by the trial judge.
When the prosecutor details evidence in his opening statement which is subsequently not admitted, he takes the risk that a mistrial may have to be granted. State v. Bell, 279 So.2d 164 (La.1973). The general rule is that absent bad faith on the part of the prosecutor or clear and substantial prejudice, the reference in the opening statement to evidence later ruled inadmissible or not produced is not a ground for a mistrial. State v. Bell, supra; State v. Green, 343 So.2d 149 (La.1977).
In the instant case, there was no bad faith by the prosecutor. Gervais and Philips were called to testify as per their plea agreement but surprised the State by refusing to testify. At this point the State rested and Horne, without moving for a mistrial or admonition, rested her case.
Horne knew of the alleged defects in the State's case and argued them to the jury. Although a mistrial or admonition was not requested by defendant, the jury was twice advised that argument of counsel was not evidence. After the guilty verdict was returned, defendant requested a new trial. The law prevents a defendant from gambling on a verdict and raising the defect in a motion for a new trial. State v. Duplissey, 529 So.2d 1379 (2nd Cir.1988).
Accordingly, we hold this assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER TWO
In this assigned error Horne argues the evidence presented was not sufficient to justify the verdict rendered.
Defendant was charged with a violation of LSA-R.S. 14:30, first degree murder. The jury returned the responsive verdict of guilty of second degree murder. See LSA-C.Cr.P. art. 814. Second degree murder is defined by LSA-R.S. 14:30.1 as follows:
"A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
* * * * * *
B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence."
In reviewing the sufficiency of evidence to support a conviction, an appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676 (La.1984). The facts established by direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Captville, supra.
In the instant case, Horne was convicted of second degree murder. The State's case centered on Horne's aiding and abetting in the murder of Daigle; not that she actually killed him. Under Louisiana law, one can be convicted of an offense while not committing the actual offense if he is found to be a principal. A principal in LSA-R.S. 14:24 is defined as:
"All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or *825 indirectly counsel or procure another to commit the crime, are principals."
Thus, to uphold the second degree murder conviction we must find the State proved Horne participated in the killing of Daigle with either a specific intent to kill or inflict great bodily harm; or, that Horne was engaged with others in the perpetration or attempted perpetration of a robbery, with or without a weapon, when Daigle was killed by the others during the course of the robbery. LSA-R.S. 14:30.1. Robbery is a general criminal intent crime and is defined as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation ..." See LSA-R.S. 14:64, 14:64.1, 14:65.
The State proved by direct evidence that Daigle was robbed of his truck and tools and murdered. It also presented circumstantial evidence from which a rational trier of fact could conclude: (1) Horne, Philips, and Gervais were without funds and being evicted from their apartment for non-payment of rents and hence had a motive to rob someone, not necessarily Daigle; (2) Horne served as the bait to lure Daigle to the apartment jointly occupied by Horne, Philips and Gervais, where he was robbed and murdered. As stated by the District Attorney in his closing arguments, the State did not have to prove defendant killed the victim or provided the murderers with their weapon. Rather, the State had to simply prove Horne provided Gervais and Philips with their victim.
Therefore, we conclude that defendant's contention there was not sufficient evidence to justify a verdict is without merit. Further, we reviewed the record for error patent and found none. Accordingly, we affirm Horne's conviction and sentence for the second degree murder of Andre Daigle.
AFFIRMED.
NOTES
[1] The indictment charged that Charles M. Gervais, Michael M. Philips and Thelma Horne committed the first degree murder of Andre Daigle. Gervais and Philips pled guilty and were sentenced to life imprisonment.
[2] Shelley's testimony was based on a limited observation.
[3] Art. 766 provides "The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge."